Argued March 6; reversed April 2, 1946

CURL ᴇᴛ ᴀʟ. *v.* NEILSON
(167 P. (2d) 320)

Before BELT, Chief Justice, and ROSSMAN, BAILEY, LUSK and BRAND, Associate Justices.

*Orval N. Thompson,* of Albany (Weatherford & Thompson, of Albany, on the brief), for appellants.

*Allison Moulton,* of Medford, for respondent.

BELT, C. J.

This is a suit for an accounting. Briefly stated, it arose out of the following facts. In 1934, Margaret Bates Lund instituted a suit to determine the legal title to the Black Channel Mine, located on a small tributary of the Rogue river in Jackson county about 25 miles north of the city of Medford. Margaret Bates Lund and her father, F. A. Bates, employed L. M. Curl, attorney at law at Albany, Oregon, to represent them in this litigation and entered into a written agreement with him to pay for such services "25% of the property recovered." Curl thereafter secured the services of the defendant, George W. Neilson, attorney at law at Medford, Oregon, to aid him in the prosecution of this suit. Neilson did not appear of record as attorney either here or in the circuit court, but, without doubt, rendered valuable services. Curl endeavored to persuade his client to compensate Neilson for his services but she refused to do so, asserting in effect that that was a matter between Curl and him. The suit

to determine title to the mine was decided by this court in November, 1935, in favor of Margaret Bates Lund and her father. *Lund v. Lund,* 152 Or. 377, 51 P. (2d) 1031. Mrs. Lund, in keeping with the contract of employment, conveyed an undivided one-fourth interest in the mine to Curl. On June 21, 1937, Curl, in order to compensate Neilson, conveyed to him a one-third interest in his one-fourth, or a one-twelfth interest in the property. This settlement or division of the Attorneys' fees was entirely satisfactory to Neilson. The title to the mining property, however, was subject to two liens—one, in favor of Walter M. Robertson, amounting with accrued interest approximately to $2,500; the other, in the sum of $6,500, in favor of Jacob F. Lund, husband of Margaret Bates Lund. Robertson began suit to foreclose his lien and obtained a decree directing that the property be sold on execution. The property was sold and the time for redemption was about to expire. Mrs. Lund, Curl and Neilson, through their joint efforts, secured a loan of $2,500 from the Bank of Shedd, Oregon, for the purpose of redeeming the property. The bank would not lend the money, however, until Margaret Bates Lund conveyed her interest in trust to L. M. Curl and authorized him to sell the property at a price deemed by him to be reasonable. It was provided in this trust agreement, so far as material herein, that the proceeds arising from a sale of the property should be disbursed as follows: (1) The money advanced on a mortgage to redeem such property should be paid together with the interest thereon and taxes against said property. (2) *Pay the "expenses, abstract of title or Title Insurance at time of sale."* (Italics ours) (3) * * *. (4) Of the remainder of the proceeds from the sale of said premises, L. M. Curl should receive one-sixth thereof

and George W. Neilson should receive one-twelfth thereof. (5) * * * The trust further provided that "when all the sums of money due as aforesaid are paid, including the expenses of making the sale of said property as hereinabove indicated, that whatever balance remains should be paid over to said Margaret Bates Lund."

Prior to the execution of this trust agreement, Margaret Bates Lund had succeeded in acquiring the interests of her father in this property and, in a property settlement arising out of a divorce procedure, secured from her former husband his interests in the mortgage lien on the property. In order to accomplish the redemption of the property, Margaret Bates Lund waived the mortgage lien of $6,500 which, of course, inured to the benefit of Curl and Neilson. It might well be said at this juncture that the waiver by Mrs. Lund of her lien of $6,500 and the conveyance of the father's interest to her made it possible to redeem the property. After the redemption, Mrs. Lund, L. M. Curl and George W. Neilson owned the property as tenants in common—Mrs. Lund having an undivided three-fourths interest therein; L. M. Curl, an undivided one-sixth interest; and George W. Neilson, a one-twelfth interest.

These co-owners soon after the redemption undertook to sell the mine. It was shown to numerous prospective purchasers, but without success. Finally, on September 12, 1937, the mine was sold to James Bruce Murray for the sum of $20,000. $2,500 was paid on the execution of the contract; the second payment of $2,500 was due on or before November 9, 1938; and the balance of the purchase price, $15,000, was to be paid on or before January 9, 1939. On the 15th day of September, 1938, a supplemental contract was entered into wherein

it was provided that George W. Neilson had the right to be present at all "clean-ups" in the mining operation, and that 30% of the returns therefrom should be applied on the contract of purchase. Prior to the sale of the mine to Murray, it had been leased to Ed Prefountain on a 30% royalty basis.

The final payment of $750 on the purchase price was not made until October 3, 1940. All payments were made to the trustee, L. M. Curl, with the exception of the second payment of $2,500 which was made to the defendant Neilson. When these funds were received by Curl, they were promptly disbursed pro rata to the other cotenants as their interests appeared. Neilson's pro rata of the last payment was retained by Curl because Neilson "had funds in his possession." Curl concedes that Neilson is entitled to a credit of one-twelfth of such sum, or $62.50.

There is no controversy as to the amount of money that Curl received nor as to the distribution of the same. The real controversy concerns the money ($696.45) received by Neilson from the Prefountain lease, and the sum of $2,500 paid to him on the purchase price. The plaintiffs contend that after Neilson has been given credit for all proper expenditures he still retains about $1,300, less the sum of $62.50, for which he must account. The defendant Neilson contends that his services rendered in the care and management of the property and in bringing about the sale —together with the expenses incurred in connection therewith—are reasonably worth the sum of $1,000 over and above the balance of the funds now retained by him. The circuit court entered a decree rendering judgment against the plaintiffs in the sum of $1,000. Hence this appeal.

When these two lawyers accepted an undivided interest in this mining property in payment of their legal services, their troubles began. There were so many conferences, so much correspondence, and so many trips necessary for the care and management of the mine and in the effort to sell the same, the property was a "headache", particularly to Curl and Neilson. Neilson, no doubt, was the most active of the three co-owners in dealing with prospective purchasers, as he resided in Medford and only 25 miles from the mine. Over 200 letters were written by Neilson to Curl concerning various problems that arose relative to the management or sale of the mine. The correspondence of Curl was equally voluminous.

Curl made no claim for additional compensation for his services or for the expenses incurred by him, although he believed, as evidenced by his letters, that neither was paid what the services were worth. Curl, however, recognized full well that he was a trustee and that the rights of the other co-owner, Mrs. Lund, could not be ignored. Mrs. Lund, no doubt, believed that she had made a fair contribution by waiving her lien of $6,500 when the property was redeemed. She therefore strenuously objected to any additional compensation to Curl or Neilson.

When the payment of $2,500 was made to Neilson, he wrote a letter to Curl, dated November 10, 1938, in which he said: "The purchasers turned over their checks for $2,500 to cover the second payment and I placed the same in the trust fund to clear; however, I had to give the abstract company a check for the $271.00 on it for the abstract and as soon as the checks clear will take care of the taxes for 1938 on the property. I trust this will be satisfactory." Neilson made no mention at this time of any claim for services rendered in

selling the property. Indeed, the first time that he asserted any such claim was in a letter dated January 26, 1941, in which he said: "I feel that I should be entitled to a 10% commission of the amount received for this property for the services rendered in its protection and sale."

Aside from the provisions of the supplemental contract relative to the right of Neilson to be present at the mine on "clean-up" days, there is no evidence of any contract, express or implied, that Neilson was to be compensated for his services rendered in bringing about the sale of the mine or that he was to be reimbursed for expenses incurred. What he did was for the common benefit of all owners. There is no evidence that he was ever requested by Mrs. Lund to make trips to San Francisco, to Portland, or any other place for the purpose of interviewing purchasers. Neilson, as a lawyer, was bound to know the law relative to the rights of cotenants in such matters.

■■ It is well settled that, in the absence of contract, a cotenant is not entitled to compensation for services rendered in managing, operating, or taking care of the common property. Equity will not undertake to measure and settle, as between cotenants, the value of their unequal services, but leaves that matter to be regulated by contract.

In Tiffany on Real Prop. (3d ed.) 267, § 450, it is said:

"One cotenant cannot assert against the other a claim to compensation for services performed by him in connection with the common property, in the absence of an agreement, express or inferable from the circumstances, that he should receive remuneration for his services. He is presumed to have performed them primarily for his own benefit, and

moreover, one cannot, ordinarily at least, thus impose a pecuniary liability on another without his assent.''

Freeman on Cotenancy (2d ed.) 345, § 260, thus states the rule:

''Compensation for his services in managing or taking care of the property is never awarded to a cotenant, except as the result of a direct agreement to that effect; or unless, from all the circumstances of the case, the Court is satisfied of the existence of a mutual understanding between the parties that the services rendered by one should be paid for by the others.''

Also to the same effect see 14 Am. Jur. 98, § 30; 62 C. J. 486, § 128; *Staples v. Pearson*, 230 Ala. 62, 159 So. 488, 98 A. L. R. 852 and note; *Kahnovsky v. Kahnovsky*, 67 R. I. 208, 21 A. (2d) 569; *Wolfe v. Childs*, 42 Colo. 121, 94 P. 292, 126 Am. St. Rep. 152; *Larkin v. McCabe*, 211 Minn. 11, 299 N. W. 649 *Keithline v. Keithline*, 106 Colo. 400, 105 P. (2d) 1086 *Von Herberg v. Von Herberg*, 6 Wash. (2d) 100, 106 P. (2d) 737.

■ *Wall v. Focke*, 21 Hawaii 399, Ann. Cas. 1916C 677, is a well considered case and is squarely in point. There it was held that a tenant in common is not entitled to compensation for services in selling the common property in the absence of an agreement therefor, and that no agreement to pay compensation will be implied from the fact that his cotenant had knowledge of the efforts to sell, acquiesced therein, and was benefited thereby.

■ Respondent relies on the provisions of the trust agreement to establish a contract authorizing payment to him for services rendered and expenses incurred. We are unable to agree that the provision concerning payment of ''expenses, abstract of title or Title

Insurance at time of sale'' support such contention. This trust agreement was drawn by the bank primarily to protect its interests and we think it was never intended by the parties thereto that Neilson, who had only a minor interest in the property, would be paid any commission for selling the same. Neither do we think it was intended to cover expenses incurred by him in attempting to so do. Undoubtedly, the provision above mentioned pertains only to those expenses ordinarily incurred in consummating such transactions, such as the costs of abstract of title and recording fees. *Thomas v. Jones,* 84 Ala. 302, 4 So. 270.

■ It is believed, however, that, by virtue of the supplemental contract, he is entitled to reasonable compensation for his services in protecting the rights of the co-owners by being present at the mine on ''clean-up'' days occurring twice each month. He should also be given credit for expenses incurred in going to and from the mine at these times. This was work performed at the special instance and request of the other co-owners, and we think the law would imply that he should be paid the reasonable value thereof.

It is impossible to ascertain from the record the value of such services and the expenses incurred by him for such purpose. The evidence shows with a reasonable degree of certainty that, after credit has been given to Neilson for all undisputed expenditures, there remains an approximate balance in his hands in the sum of $1,300 less the sum of $62.50, being Neilson's pro rata of the last payment of the purchase price. In view of the state of the record, it is necessary to remand this cause with directions to take additional testimony to ascertain the value of Neilson's services in attending the mine on ''clean-up'' days, together with

his expenses in going to and from the mine, and then to deduct or set off the sum representing the value thereof against the above balance of $1,237.50 and to enter judgment accordingly.

The decree is reversed and the cause remanded with directions to proceed in keeping with this opinion. Each party will pay his own costs and disbursements.